UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MARY R. CALDWELL, an individual,

      Plaintiff,

v.                        Civil Action No. 2:14-cv-25242

STANDARD INSURANCE COMPANY, an Oregon
Corporation, CHARLESTON AREA MEDICAL CENTER, INC.,
LONG TERM DISABILITY PLAN, an employee benefit plan,
and DOES 1 through 10, inclusive,

      Defendants.


MEMORANDUM OPINION AND ORDER


      Pending are the cross motions for summary judgment of plaintiff Mary Caldwell ("Caldwell") and defendants Standard Insurance Company ("Standard") and Charleston Area Medical Center Inc., Long Term Disability Plan ("the Plan"), each filed February 9, 2015.


I.    Background


      Plaintiff Mary R. Caldwell ("Caldwell") was formerly employed as a patient accounts analyst by Charleston Area Medical Center ("CAMC").  (Stipulations ¶ 7)(ECF 33).  CAMC, through the Plan, is the policyholder of a group long term disability insurance policy ("the policy") purchased from defendant Standard Insurance Company ("Standard").  Id. ¶ 4.

Standard is both the insurer responsible for paying claims made by Plan participants and the plan administrator who determines which participants are eligible for benefits.  The policy, as a component of the plan, is subject to the regulatory provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq ("ERISA").

It is uncontested that Caldwell was a qualified participant in the Plan and thus covered by the policy on January 4, 2011, the day she stopped working for CAMC and applied for disability benefits.  (Stipulations ¶ 7).  Caldwell, who has a documented history of back pain, cites "Acute Neck, Shoulder, Arm + low back pain" and "depression due to chronic pain" as the basis of her disability.  Administrative Record at * 249 (hereinafter "AR ___").  Caldwell's claim was approved and, beginning January 11, 2011, she received short term benefits for a nearly 90 day period in accordance with the terms of the policy.  When those were exhausted, Standard approved her claim for long term benefits.  She received long term benefits for a period of twenty-four months beginning on April 5, 2011 and ending on April 4, 2013.

Standard contends that, under the terms of the policy, Caldwell was not entitled to more than twenty-four months of long term benefits.  Standard relies on each of two Plan

2

provisions that applied after that twenty-four month period had run.  First, further benefits are limited by virtue of the elimination of coverage for certain specified physical ailments and for mental disorders such as depression; Standard initially found that Caldwell's claim is grounded on the eliminated conditions (AR 1348), but, on review of further submissions by Caldwell, Standard acknowledges that she is afflicted with documented radiculopathy and a herniated disc (AR 1429), conditions that are exempt from the limitations.  Second, whatever the medical condition, coverage is denied one who is capable of performing an occupation in which one can earn at least 80% of one's predisability earnings; Standard finds that Caldwell is capable of sedentary work that would enable her to earn at the minimal 80% level.  (AR 1349, 1429, 1431).  Caldwell contests Standards findings, and alleges that Standard's review process was flawed and tainted by a structural conflict of interest.

     The parties have cross-moved for summary judgment. Caldwell asks the court to award her the long term benefits she believes she is entitled to under the terms of the policy or, in the alternative, remand the case to Standard for reconsideration of its denial of those benefits under instruction to properly consider all the relevant evidence.  Standard asks the court to

affirm its determination that Caldwell no longer qualified as disabled on April 4, 2013, and to confirm its decision to stop providing her long term benefits as of that date.

Caldwell has fully exhausted her administrative remedies and invoked ERISA's civil enforcement provision, 29 U.S.C. § 1132.  This court has jurisdiction consonant with the aforementioned section, inasmuch as ERISA is a federal statute and this case arises under federal law.  28 U.S.C. § 1331, see also 29 U.S.C. § 1132(a)(1)(B), id. at (e)(1).

## II.  The Governing Standard

A plaintiffs' § 1132 claim challenging a denial of benefits is analogous to a claim arising under the common law of trusts.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989).  Accordingly, a jury trial is inappropriate, and such claims are properly decided through cross-motions for summary judgment on the basis of the administrative record that was relied upon by the plan administrator who denied the benefits claim.  See Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1007 (4th Cir. 1985), In re Vorpahl, 695 F.2d 318, 320 (8th Cir. 1982).

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and

4

any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

## III. <u>Discussion</u>

ERISA is a comprehensive statutory scheme that regulates qualifying employee pension and welfare-benefits plans, including those that provide disability insurance.  <u>See generally</u> <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724 (1985).  ERISA "establishes various uniform procedural standards concerning reporting, disclosure, and fiduciary responsibility" for such plans, but "does not regulate the[ir] substantive content."  <u>Id.</u> at 732.

"[E]mployers have large leeway to design disability and other welfare plans as they see fit."  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 833 (2003).  "The plan, in short, is at the center of ERISA."  <u>US Airways, Inc. v. McCutchen</u>, 133 S. Ct. 1537, 1548 (2013).  Unsurprisingly, given this focus on the individualized nature of each ERISA plan, "the validity of a claim to benefits under an ERISA plan is likely to

5

turn on the interpretation of terms in the plan at issue."
Firestone Tire, 489 U.S. at 115.

A.

Before the court addresses the merits of the parties'
arguments, the court must determine what level of deference
should be afforded Standard's decision to deny Caldwell
benefits.

An ERISA plan administrator's decision to deny
benefits is reviewed de novo "unless the benefit plan gives the
administrator or fiduciary discretionary authority to determine
eligibility for benefits or to construe the terms of the plan."
Firestone Tire, 489 U.S. at 115 (1989).  If the plan
administrator is conferred discretion by the terms of the plan,
the proper standard of review is abuse of discretion.  See
Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008).

Here, the policy contains an "allocation of authority"
provision which provides that:

> Except for those functions which the [policy]
> specifically reserves to the Policyholder or Employer,
> [Standard] ha[s] full and exclusive authority to control
> and manage the [policy], to administer claims, and to
> interpret the [policy] and resolve all questions arising
> in the administration, interpretation, and application
> of the [policy].

6

[Standard's] authority includes, but is not limited to:

   1. The right to resolve all matters when a review
      has been requested;

   2. The right to establish and enforce rules and
      procedures for the administration of the [policy]
      and any claim under it:

   3. The right to determine:
      a. Eligibility for insurance:
      b. Entitlement to benefits:
      c. The amount of benefits payable: and
      d. The sufficiency and the amount of information
         we may reasonably require to determine a., b.,
         or c., above.

Subject to the review procedures of the [policy], any
decision we make in the exercise of our authority is
conclusive and binding.

(AR 34-35).  This provision unambiguously grants Standard

discretion to determine if a Plan participant is eligible for

benefits, and courts interpreting this same provision have

concluded that it confers Standard sufficient discretion to

warrant abuse-of-discretion review of such a determination.  See

e.g., Hankins v. Standard Ins. Co., 677 F.3d 830, 835 (8th Cir.

2012), Fleischer v. Standard Ins. Co., 679 F.3d 116, 122 (3d

Cir. 2012); Black v. Long Term Disability Ins., 582 F.3d 738,

744 (7th Cir. 2009).  Caldwell does not contest the validity of

the allocation of authority clause and concedes that the policy

confers Standard discretion when making a benefits

determination.  <u>See</u> (Stipulations ¶ 6).[1]  Despite this
concession, Caldwell argues that "the presence of a substantial
conflict of interest" and Standard's "history of claims
handling" should result in the court "alter[ing] its standard of
review by not acting as deferentially as would otherwise be
appropriate."  Pl. Mem. of Law in Supp. Mot. for Summ. J. at *
17.  Inasmuch as nothing relating to Standard's history of
claims handling has been furnished, the court confines its
attention to the claimed conflict of interest.[2]

Prior to 2008, precedent from our Court of Appeals
permitted a reviewing court to apply a "modified abuse-of-
discretion standard" in order to "neutralize any effect" of an

---

[1] Paragraph six of the parties' Stipulations reads, in its
entirety:
   The [policy] confers Standard with discretion, and the
   applicable standard of judicial review of Standard's claim
   determination is the "abuse of discretion" standard.
Standard argues that this stipulation precludes Caldwell from
arguing that a less deferential standard of review should be
applied.  However, the applicable standard of review is a
question of law and "a court is not governed by a stipulation
on a question of law."  <u>Fisher v. First Stamford Bank & Trust
Co.</u>, 751 F.2d 519, 523 (2nd Cir. 1984)(citing <u>Swift & Co. v.
Hocking Valley Ry. Co.</u>, 243 U.S. 281, 289 (1917)).

[2] Caldwell notes in her memorandum in support of her motion for
summary judgment that her argument concerning Standard's history
of claims handling, which is not expounded upon therein, "may be
addressed" in her "Opposition brief" because of "page
limitations."  Pl. Mem. of Law. in Supp. Mot. for Summ. J. at *
17 n. 7.  However, no argument concerning Standard's claims
handling history is included in Caldwell's response in
opposition to Standard's motion for summary judgment.

alleged conflict of interest. <u>Champion v. Black & Decker (U.S.)</u> <u>Inc.</u>, 550 F.3d 353, 355 (4th Cir. 2008). But in <u>Glenn</u>, "the Supreme Court clarified that the presence of a plan administrator's conflict of interest [does] not alter the abuse-of-discretion standard of review." <u>Williams v. Metro. Life Ins.</u> <u>Co.</u>, 609 F.3d 622, 630-31 (4th Cir. 2010). Instead, "courts should view any such conflict of interest as but one factor" to be considered when "reviewing the reasonableness of a plan administrator's discretionary decision." <u>Id.</u> at 631.

Caldwell does not, as Standard suggests, argue that the court should apply the repudiated modified abuse-of-discretion standard. Instead, Caldwell argues that Standard's dual role as insurer and plan administrator should be considered during the courts' application of the traditional abuse-of-discretion standard, and that the level of discretion afforded by the court to Standard's decision, in light of that factor, "should be lessened." Pl. Mem. of Law in Supp. Mot. for Summ. J. at * 17.

Caldwell is correct that it is permissible for a court to take this factor into account when considering what level of deference is appropriate. <u>See</u> <u>Champion</u>, 550 F.3d at 359 (stating that when reviewing an ERISA administrator's determination "for abuse of discretion . . . a[] conflict of

interest" can be considered "as one of the factors considered in determining reasonableness.").

When considering a factor that suggests a plan administrator did not act reasonably and thereby abused its discretion, it must be weighed against other indicators that the administrator "was not inherently biased." See Williams, 609 F.3d at 632. Williams is instructive on this point. There the insurer, like Standard, served in "the dual role of evaluating claims for benefits and of paying benefit claims." Id. However, Williams held that a "structural conflict of interest should not have a significant role in the analysis" when the insurer's conduct during the claims-handling process demonstrates a lack of bias. Id. The insurer in Williams demonstrated its lack of bias by initially determining that the plaintiff seeking benefits was disabled, paying long term disability benefits to that plaintiff for almost two years, and basing its decision to stop paying benefits on a review of the plaintiff's medical records conducted by two independent doctors. Id.

A review of the administrative record reveals that Standard acted in a similar manner to the insurer in Williams. Caldwell stopped working on January 4, 2011 and applied for short term benefits. See (AR 295). After providing

10

documentation of her medical condition, Caldwell's application was approved and she received short term benefits for nearly the maximum 90-day period of time allowed for such benefits under the terms of the policy. See (AR 307-09, 353-54). As her eligibility for short term benefits drew to a close, Standard began reviewing Caldwell's eligibility for long term benefits. (AR 353-54). On April 11, 2011, Standard informed Caldwell that her claim for long term benefits had been approved. (AR 427-28). She was deemed eligible for and received long term benefits under the Plan's "Own Occupation" definition of disability until April 4, 2013 – a period of twenty-four months – the maximum time period under which the policy permits benefits under the "Own Occupation" definition of disability. See (AR 962-64).

Standard also informed Caldwell that her eligibility for benefits might extend beyond April 4, 2013, explaining in a letter one year earlier that it would "analyze the medical and vocational information available to us" and inviting Caldwell to submit relevant documents and other evidence for review. Id. In March of 2013, Standard provided medical records and other pertinent information to a consulting physician, Dr. Mark Shih, and a certified rehabilitation counselor, Susan Martin, in order to obtain an independent evaluation of Caldwell's medical

11

condition and vocational aptitude to determine if she still qualified as disabled (under the more stringent "Any Occupation" definition of disability) in light of her continuing medical problems.  See (AR 1319-22, 1327-28, 1330-42).  Relying on these evaluations, Standard determined that Caldwell would not qualify for long term benefits after April 4, 2013.  In September 2013, after receiving additional information from Caldwell, Standard reevaluated Caldwell's claim by engaging a second consulting physician, Dr. Hans Carlson, and a second Certified Rehabilitation counselor, Karol Paquette, to assess Caldwell's medical and vocational status.  See (AR 1401-16, 1423). Standard again determined that Caldwell did not qualify for additional long term benefits.  After receiving still more information from Caldwell, Standard undertook an additional evaluation of her claim (again conducted by Dr. Carlson) in October 2013, despite having no obligation under either the terms of the policy or ERISA to do so.  See (AR 1458-60).

        Thus, Standard initially determined that Caldwell was disabled, paid long term benefits to her for a two-year period, and only terminated her benefits after engaging in an independent review of her medical records and vocational aptitude.  Because Standard's conduct essentially mirrors that of the insurer in Williams, the conclusion reached by our Court

12

of Appeals in that case is also appropriate here.  Accordingly, the court need not reduce the amount of deference afforded to Standard on the basis of the alleged conflict of interest.

Moreover, the court's review of the administrative record demonstrates that Caldwell's allegation that Standard withheld information from the consulting physicians who reviewed her medical records is baseless.  In contrast, the record, as described above, demonstrates that Standard provided first Dr. Shih and then Dr. Carlson, as well as the two certified rehabilitation counselors, with the entirety of the records in Standard's possession when each of the reviews was conducted, and as soon as any additional information was made available by Caldwell, that information was handed over to the medical professionals for review.  Consequently, the court reviews Standard's determination that Caldwell was no longer eligible for long term benefits after April 4, 2013 for abuse of discretion.

B.

When applying the abuse-of-discretion standard to the decision of an ERISA plan administrator, the administrator's decision "will not be disturbed if reasonable, even if the court would have reached a different conclusion."  <u>Booth v. Wal-Mart</u>

13

<u>Stores, Inc. Associates Health & Welfare Plan</u>, 201 F.3d 335, 341

(4th Cir. 2000).  In <u>Booth</u>, our Court of Appeals provided the

following nonexclusive list of criteria that "a court may

consider" when "determining the reasonableness" of an ERISA

administrator's decision:

> (1) the language of the plan; (2) the purposes and goals
> of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to which
> they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent with
> the procedural and substantive requirements of ERISA;
> (7) any external standard relevant to the exercise of
> discretion; and (8) the fiduciary's motives and any
> conflict of interest it may have.

<u>Booth</u> 201 F.3d at 342-43 (4th Cir. 2000).  With these factors in

mind, particularly the first, third, and fifth, the court turns

to the administrative record and evaluates whether Standard's

decision to deny Caldwell benefits after April 4, 2013 was

reasonable.

As noted, Caldwell stopped working on January 4, 2011.

She was initially awarded short term benefits, then subsequently

applied for long term benefits.  Under the terms of the policy,

a participant who had not previously received long term benefits

may qualify as disabled, and is eligible for long term benefits,

if that individual can satisfy the "Own Occupation" definition[3] of disability.  <u>See</u> (AR 12)(Defining the "Own Occupation Period" as "the first 24 months [during] which [long term benefits] are paid.").  After twenty-four months, the definition of disability that must be satisfied is the "Any Occupation" definition.[4]  <u>Id.</u>

Caldwell's application for long term benefits was approved on April 11, 2011, and those benefits were retroactive to April 4, 2011.  (AR 427-28).  She qualified as disabled under the "Own Occupation" definition of disability, and would remain eligible for benefits under that definition until April 4, 2013. On that date, Caldwell's continued eligibility was dependent upon her ability to satisfy the policy's "Any Occupation" definition of disability.  Additionally, that date marked the end of Caldwell's first twenty-four months of long term benefits.  This twenty-four month period is significant because

---

[3] **The policy "Own Occupation" definition of disability is:**

**You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:**

**1.You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and**
**2.You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.**
**(AR 18)**
[4] **The policy's "Any Occupation" definition of disability is included in section D, page 23, <u>infra</u>.**

the policy's limited pay period provision states that the
aggregate period for which a participant can receive benefits
for a disease or disorder of the cervical, thoracic, or
lumbosacral back is limited to twenty-four months.  (AR 20).

C.

Under the terms of the policy, a participant cannot
receive long term benefits for more than twenty-four months for
mental disorders, substance abuse, and "other limited
conditions."  (AR 30), see also (AR 32)("No [long term] Benefits
will be payable after the end of the limited pay period, unless
on that date you continue to be Disabled as a result of a
physical Disease, Injury, or Pregnancy for which the payment of
[long term] Benefits is not limited.").  The policy defines
"other limited conditions" for our purposes as:

Other Limited Conditions means . . . fibromyalgia[5] . . .
diseases or disorders of the cervical, thoracic, or
lumbosacral back and its surrounding soft tissue . . . .

(AR 31)(emphasis added).  However, the policy also includes a

---

[5] There is some evidence in the record suggesting that Caldwell
suffers from fibromyalgia, a condition which causes chronic
pain.  See e.g. (AR 1043, 1315, 1320).  There is no evidence in
the record suggesting that Caldwell's fibromyalgia caused the
necessary functional limitations that would qualify her as
disabled as defined in the policy.  Moreover, to the extent she
did cite fibromyalgia as a basis of her disability, it is clear
that fibromyalgia is one of the conditions included in the
policy's limited pay period provision, and thus could not
entitle Caldwell to more than twenty-four months of long term
benefits.

list of exceptions for conditions that might appear to fall within the list of limited conditions, but actually are not subject to the limitation:

> Other Limited Conditions does not include . . . herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging, . . . radiculopathies that are documented by electromyogram . . . .

Id.

As noted above, Caldwell generally cited "Acute Neck, Shoulder, Arm + low back pain" and "depression due to chronic pain" as the basis of her disability claim.  See (AR 249-50).  A March 24, 2011 report from Caldwell's treating physician, Dr. Susan Cavender, specifically diagnosed the causes of Caldwell's pain as "cervical disc disease with radicular pain" and "lumbar disc disease with radicular pain," and also provided the "secondary diagnosis" of "depression due to chronic pain."  (AR 340).  Dr. Cavender was Caldwell's only treating physician until Standard began its evaluation of her continued disabled status. (AR 1267, 1313).

Given the policy's definition of "mental disorders,"[6] the limited pay period provision clearly precludes Caldwell from receiving more than twenty-four months of long term benefits for

---

[6] The policy's definition of mental disorders includes "depression and depressive disorders." (AR 31)

her depression.  The only condition which Caldwell had
documented and could cite to as the basis of her continuing
disability, before she provided additional records in August,
2013, was the pain that Dr. Cavender had stated flowed from
Caldwell's disc disease.

    As discussed above, in March of 2013, Standard engaged
two medical professionals to conduct a review to assess
Caldwell's medical and occupation status, in order to determine
whether or not she would continue to be eligible for long term
benefits.  Dr. Mark Shih evaluated all the medical records in
Standard's possession at that time and prepared a written report
dated March 10, 2013.  (AR 1319-1322).  Dr. Shih reviewed
records from eight of Caldwell's visits to Dr. Cavender over the
period from December 2010 to June 2012.  (AR 1320).  Dr. Shih
concluded, on the basis of this review, that Caldwell's "current
impairing conditions" are "cervical and lumbar [degenerative
disc disease] with chronic pain."  **Id.**  He further concluded
that "[Caldwell's] conditions are due to a disease or disorder
of the cervical, thoracolumbar spine and surrounding soft
tissues and chronic pain."  **Id.** at 1321.  Dr. Shih also noted
that Caldwell's records did not contain any evidence of a
herniated disc "documented by EMG, CT, or MRI [or a] so
documented radiculopathy."  **Id.**  Relying on Dr. Shih's

18

evaluation, Standard determined that Caldwell's chronic pain and depression were subject to the limited pay period provision. See (AR 1345-51). Standard also engaged a certified rehabilitation counselor, Susan Martin, to assess Caldwell's vocational aptitude in light of her medical condition. Martin concluded that even if Caldwell's medical condition was not subject to the limited pay period provision, she would not qualify as disabled because she was capable of performing "sedentary" work and there were sedentary jobs available in the Charleston Metropolitan Statistical Area in which Caldwell could have earned at least 80 percent of her indexed predisability earnings. (AR 1332-39).

Standard informed Caldwell of this determination by letter, informed her that she was entitled to seek a review of the decision, and invited Caldwell to submit any evidence that would demonstrate her condition was not subject to the limited pay period, or other evidence that would qualify her as disabled under the policy's "Any Occupation" definition of disability. Id.

D.

On April 26, 2013, Caldwell wrote a letter to Standard formally requesting a review of the determination, predicated

19

primarily on Dr. Shih's report, that she was no longer eligible for long term benefits.  (AR 1364).  In her letter, Caldwell noted that she was working with Dr. Cavender to obtain and provide to Standard the evidence necessary to demonstrate her continued eligibility for benefits.  On June 10, 2013, Dr. Cavender called Standard seeking clarification of the evidentiary requirements under the policy.  (AR 1378).  During that call, Dr. Cavender noted that she had not performed any diagnostic tests on Caldwell since 2009, but that she would talk to Caldwell about scheduling such tests.  Id.

In August 2013, Caldwell provided Standard with new medical records for review.  Those records included four diagnostic tests performed by a neurologist, Dr. Gary Weiss: an MRI of Caldwell's shoulder, an MRI of her thoracic spine, an MRI of her lumbar and cervical spine, and an EMG of her spine.  (AR 1390).  According to Dr. Weiss's report, the MRI of Caldwell's thoracic spine revealed a "HNP[7] at T 8-9."  Id.  The MRI of her

---

[7] "HNP" is the medical abbreviation for "Herniated nucleus pulposus."  See What Does HNP Stand For?, (Aug. 10, 2015) https://www.laserspineinstitute.com/back_problems/hnp/stand. The nucleus pulposus is "gel-like inner material that is contained within intervertebral discs, which [themselves] are the protective cartilaginous pads situated between adjacent vertebrae."  Id.  A tear or rupture of one of these discs is an HNP, or colloquially, a "herniated disc."  Id.  It is worth noting that "an HNP is not in and of itself painful.  Only when the extruded nucleus pulposus leaks into the spinal canal and presses on the nearby spinal nerves or the spinal cord do symptoms present."  Id.

lumbar and cervical spine revealed a "HNP L5-S1" and "HNPs C 3-4, C 4-5, and C 5-6." Id. The EMG also revealed "left C6 and left S1 radiculopathies."[8] Id. Dr. Weiss's report also contained an "Assessment" which noted the presence of the aforementioned HNPs and radiculopathies, as well as noting the presence of "possible [spinal] cord compression with left Babinski sign."

Presented with this new information, Standard engaged a different doctor and rehabilitation counselor to reevaluate Caldwell's medical and vocational status. As noted, Standard's September review of Caldwell's medical record was undertaken by Dr. Hans Carlson. Dr. Carlson did not limit his review to the new evidence from Dr. Weiss, but also reevaluated Caldwell's medical records from Dr. Cavender. (AR 1401). He acknowledged that Caldwell's new evidence included "abnormal electrodiagnostic studies," including "left C6 and left S1 radiculopathies," but ultimately concluded that Caldwell's

---

[8] Radiculopathy is the "blanket word used to describe all of the symptoms of nerve compression, such as neck or back pain, muscle weakness, numbness or tingling in the extremities, pain that radiates along a nerve and diminished reflexes." See Radiculopathy Definition, (Aug. 10, 2015) https://www.laserspineinstitute.com/learn_more/glossary/definition/radiculopathy/104/. A radiculopathy can "can originate at any level of the spine, but are most commonly exhibited in the lumbar (low back) and cervical (neck) segments because of their weight burden and flexibility." Id.

"chronic spine pain" fell under the category of a "disease or disorder of the cervical, thoracic, or lumbosacral back and surrounding soft tissue." Id. at 1402. Furthermore, Dr. Carlson concluded that "an individual with the above findings would be capable of performing sedentary work with [some] limitations and restrictions . . . on a full time basis." Id. That conclusion was echoed by the certified rehabilitation counselor who reviewed Caldwell's records, Karol Paquette. (AR 1423).

Relying on these reviews of the newly presented medical evidence, Standard had to answer two questions in order to make a determination concerning Caldwell's continuing eligibility for long term benefits: first, had Caldwell produced sufficient evidence of a condition exempted from the limited pay period provision, and second, had Caldwell produced sufficient evidence of a condition that rendered her disabled under the "Any Occupation" definition of disability?

Answering the first question required engagement with Dr. Carlson's conclusion that the new diagnostic tests showed evidence of medical conditions exempted from the limited pay period provision. See (AR 31)(exempting from provision "herniated disc[s] . . . documented by electromyogram and computerized tomography or magnetic resonance imaging . . . or

22

radiculopathies that are documented by electromyogram."
However, merely establishing the existence of an exempt medical
condition did not automatically render Caldwell disabled.  See
Felton-Miller v. Astrue, 459 Fed.Appx. 226, 229-230 (4th Cir.
2011)(per curiam)("[M]edical conditions alone do not entitle a
claimant to disability benefits; 'there must be a showing of
related functional loss.'")(quoting Gross v. Heckler, 785 F.2d
1163, 1166 (4th Cir. 1986)), see also Houston v. Provident Life
& Acc. Ins. Co., 390 F.3d 990, 996 (7th Cir. 2004) (holding that
an MRI which revealed a herniated disc "merely aided . . .
diagnosis" and did not, on its own, represent documentation of a
medical condition that rendered the plaintiff unable to perform
sedentary work.).  Standard still had to assess whether Caldwell
qualified as disabled under the policy's "Any Occupation"
definition of disability, which reads:

> You are Disabled from all occupations if, as a result of
> Physical Disease, Injury, Pregnancy or Mental Disorder,
> you are unable to perform with reasonable continuity the
> Material Duties of Any Occupation.
>
> Any Occupation means any occupation or employment which
> you are able to perform, whether due to education,
> training, or experience, which is available at one or
> more locations in the national economy and in which you
> can be expected to earn at least 80% of your Indexed
> Predisability Earnings within twelve months following
> your return to work, regardless of whether you are
> working in that or any other occupation.

(AR 19).

     It is clear from this language, read in concert with

the limited pay period provision, that Caldwell only qualified as disabled if she suffered from a non-limited condition that had the effect of preventing her from engaging in any occupation as therein defined.  It is also important to note that providing medical evidence of a condition exempted from the limited pay period provision does not permit Caldwell to use the presence of an exempt condition as a way to receive benefits for symptoms caused by a limited condition.

On September 23, 2013, Standard informed Caldwell by letter that, relying on Dr. Carlson's conclusion, it had upheld the original determination that she was not eligible for long term benefits after April 4, 2013.  (AR 1426-33).  In its letter Standard acknowledged that the diagnostic tests conducted by Dr. Weiss revealed "radiculopath[ies] . . . not subject to the 24 month limitation" and "a disc herniation at T8-9."  (AR 1428).  However, Standard explained that it had determined, on the basis of medical advice provided by its consulting physicians, that "left C6 and S1 radiculopathies and a herniated disc would not prevent a person from working in a full time sedentary level occupation."  Id.  Crucially, Standard distinguished Caldwell's chronic neck, back and shoulder pain, and the depression stemming from that pain, from the effects and symptoms caused by the documented radiculopathies and herniation.  See id. at 1429 (explaining that "[y]our chronic neck and back pain, shoulder

24

pain, fibromyalgia and depression/anxiety (if these had been
supported) are considered part of the 24 month lifetime
limitation.  That means [that] while you may still have these
conditions, after the 24 months, they are considered limit[ed]
conditions and no benefits would be paid for these
conditions.").

        Standard explained that it focused its "Any
Occupations" review on the non-limited conditions, and concluded
that, despite the presence of those medical conditions, Caldwell
would be capable of performing sedentary level work subject to
certain restrictions.  <u>Id.</u>  Standard stated:

> We are considering radiculopathy and herniated disc
> during the Any Occupation review with the associated
> limitations and restrictions of not being able to do
> constant bending, stooping, twisting, or overhead
> activities, able to stand and walk occasionally and be
> able to sit frequently with the ability to reposition as
> needed from sitting to standing position. We have
> determined you would be able to perform sedentary level
> work based on the limitations noted as above.

<u>Id.</u>  Standard also noted that Caldwell had "34 years of
knowledge in multiple areas and [thus] you do have transferrable
skills that would be applicable for other occupations," which
supported the determinations reached by both Dr. Carlson and Ms.
Paquette that there were jobs which Caldwell could perform in
which she would be able to earn at least 80 percent of her
predisability income.  (AR 1430).  Those jobs "included the

occupations of Computer Support Specialist, Office Manager and

[Caldwell's] Own Occupation as a Management Analyst." (AR 1431).

In its letter of March 28, 2013, Standard noted:

> These occupations are meant as examples only and do not
> represent all of the occupations for which you may
> qualify when you consider your education, prior work
> experience, and the training you received in your prior
> occupations.  You have a documented work history of 10
> years of managing staff with responsibility for hiring,
> firing, performance evaluations and handling
> disciplinary issues.  You spent 30 years assigning and
> reviewing work quality with day to day tasks as a
> Patient Account Analyst, with direct involvement in
> analysis of procedures and revision of procedures to
> maximize efficiency and profitability.  The combined
> tasks that you have performed for the past 30 years well
> equips you for the position of Office Manager and
> Computer Support Specialist.
>
> ***
>
> The occupations identified allow for your physical
> limitations and restrictions, exist in sufficient
> numbers to allow reentry into the workforce, and pay
> wages that will meet the Group Policy's target wage
> within twelve months of you beginning work in these
> occupations.

(AR 1349, 1350).

Finally, Standard explained that it had considered the

fact that the Social Security Administration, though finding

Caldwell able to perform sedentary work, had declared her to be

disabled.  In doing so, the SSA Administrative Law Judge found

that the demands of her past relevant work exceed her residual

functional capacity and that her acquired job skills do not

transfer to other occupations within her residual functional capacity.  (AR 1177).  Standard noted, however, that its "disability determination differs from Social Security" because "Social Security makes disability determinations based on different criteria than what is stated in the . . Policy."  Id.

On October 24, 2013, Standard received additional medical records from Caldwell, including copies of an EMG and MRI conducted by Dr. Weiss in August of 2013.  (AR 1444-46, 1449-57).  Although not obligated under the terms of the policy to conduct any more administrative appeals, Standard agreed to conduct one.  See (AR 1458-60).  Dr. Carlson examined the new records provided by Caldwell, noted that the "new records appear to be fairly consistent with the prior records," and concluded that "the claimant does not appear to have any impairment from a cervical or lumbar radiculopathy."  (AR 1466-67).  Relying on Dr. Carlson's conclusion, Standard informed Caldwell that her additional appeal of the benefits determination was denied.  (AR 1468-69).

When applying the abuse-of-discretion standard in an ERISA case, a district court plays a "secondary rather than primary role in determining a claimant's right to benefits." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 323 (4th Cir. 2008).  That is, if the plan administrator acts

reasonably, it is inappropriate to "substitute [the court's] judgment in place of the judgment of the plan administrator." Id.  A plan administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id. at 322.  Substantial evidence has been held to be "more than a scintilla, but less than a preponderance" and that "which a reasoning mind would accept as sufficient to support a particular conclusion." Clark v. Nationwide Mut. Ins. Co., 933 F. Supp. 2d 862, 880 (S.D.W. Va. 2013)(internal quotations omitted).

After reviewing the administrative record, the court finds that Standard's decision concerning Caldwell's eligibility for benefits was reasonable.  Standard engaged in a reasoned and principled decisionmaking process that took into account all of the evidence that Caldwell presented, relied on the judgment of independent consulting physicians, and reached a conclusion logically consistent with the language of the relevant provisions of the policy.  At the time of its initial decision, Standard considered all the evidence in its possession, and noting the likelihood that additional relevant evidence existed, encouraged Caldwell to submit any evidence she wanted considered.  Standard subsequently considered the additional evidence provided by Caldwell, even when that evidence was

submitted outside of the timeframe set forth in the policy,[9] and permitted a second, voluntary review despite not being required to do so.

While it might be possible for a court analyzing the record de novo to disagree with the conclusion reached by Standard, that is not the inquiry that precedent dictates the court undertake in this case.  Instead, the court is asked to decide if Standard's decision was an abuse of discretion. Having found Standard's decisionmaking process to be reasoned, principled and based on substantial evidence, the court must conclude that Standard did not abuse its discretion when it determined that Caldwell did not qualify as disabled under the "Any Occupation" definition of disability, and thus was not eligible for long term benefits after April 4, 2013.

---

[9] Under the terms of the policy, Standard is obligated to provide a participant with a review of a benefits decision within 45 days of a formal request.  See (AR 33)("[Standard] will review your claim promptly after we receive your request [for such a review]. Within 45 days after we receive your request for review we will send you: (a) a written decision on review; or (b) a notice that we are extending the review period for 45 days. . . . If we request additional information, you will have 45 days to provide that information.  If you do not provide the requested information within 45 days, we may conclude our review of your claim based on the information we have received)(emphasis added).  Caldwell formally requested a review on April 26, 2013, and no extension was sought or issued, but Caldwell did not submit any new medical records until August 2013, nearly two months after the 45 day time period contemplated in the policy had expired.

## IV.   Conclusion and Order

For the foregoing reasons, the court ORDERS that defendants' motion for summary judgment be, and hereby is, granted.   The court further ORDERS that the plaintiff's motion for summary judgment be, and hereby is, denied.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: August 25, 2015

John T. Copenhaver, Jr.
United States District Judge

30